**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Jason Craven,

        Plaintiff,

v.

Clay Springs-Pinedale Fire District, et al.,

        Defendants.

No. CV-20-08014-PCT-ROS

**ORDER**

In 2006, Plaintiff Jason Craven began working as a volunteer firefighter for Defendant Clay Springs-Pinedale Fire District.  In approximately 2010, Craven was appointed "Wildland Coordinator" to lead the Fire District's newly created "Wildland Division."  While in that position Craven repeatedly complained to Defendant Robert Garvin—the Fire Chief responsible for day-to-day management of the Fire District—about the Wildland Division's finances and pay practices.  Craven also complained to members of the five-member board responsible for the overall management of the Fire District.

In 2019, the board voted unanimously to dissolve the Wildland Division, meaning Craven lost his position as Wildland Coordinator.  Craven subsequently filed this suit against the Fire District, Chief Garvin, the fire board, and the five board members. According to Craven, the Wildland Division was dissolved in retaliation for his speech. Craven also alleges he was not paid for all the work he performed and that a statement by Chief Garvin regarding Craven's drinking habits was defamatory or cast him in a false

light.  Defendants seek summary judgment on all claims.  Because there are material disputes of fact regarding most claims, the motion for summary judgment will, in large part, be denied.

## BACKGROUND

The parties have many factual disputes involving matters that do not impact analysis of Defendants' motion.  However, the many inconsequential factual disputes, as well as unexplained gaps in the record, make it difficult to recount a coherent version of the background facts.  The following represent the undisputed facts or, when disputed, the version of events most favorable to Craven.

The Clay Springs-Pinedale Fire District provides fire protection and emergency services around Pinedale, Arizona.  The Fire District "is governed by a five-person board."  (Doc. 72 at 2).  That board is responsible for managing the Fire District, including the appointment of a Fire Chief to handle the "day-to-day operations" of the Fire District.  (Doc. 72 at 2).  At all relevant times, the five board members were Defendants Bob Quackenbush, Mike Neill, David Flores, Joe Holyoak, and Sue Hileman. The board held monthly meetings to vote on management issues, such as budget matters.

In 1987, Robert Garvin joined the Fire District as a volunteer firefighter.  Garvin was appointed "volunteer Fire Chief in 2002" and, in 2013, Garvin was appointed to the "full-time, paid" position of Fire Chief.  (Doc. 72 at 2).  As Fire Chief, Garvin was responsible for managing the Fire District and approximately 20 volunteer firefighters. (Doc. 72-1 at 8).  While the parties consistently refer to "volunteer firefighters," that description is somewhat misleading.  The volunteer firefighters were not paid a full-time wage but they were paid for attending trainings or when called out on medical or fire calls.  At the times relevant to this suit, volunteer firefighters were paid $10 for each training they attended as well as $10 to $20 per call, depending on the individual firefighter's qualifications.  (Doc. 72-1 at 18).

The present case involves the Fire District's decision to get involved in fighting "wildland fires."  This term refers to "fires that occur on state or federal government

property." (Doc. 71 at 3). According to Defendants, fire districts often agree to help fight wildland fires because fire districts "can charge the state or federal government a fee for use of [the fire district's] personnel and equipment." (Doc. 71 at 3). In other words, fighting wildland fires can be a source of additional revenue for a fire district.

In 2006, Craven started working for the Fire District as a volunteer firefighter. Shortly after being hired, Craven approached Chief Garvin about starting a "Wildland Division" to fight wildland fires. (Doc. 72-1 at 19-20). Chief Garvin did not take immediate action but, in approximately 2010 or 2011, Craven was appointed "Wildland Coordinator." The parties do not indicate whether this appointment was made by Chief Garvin or the board. But it appears that, at the time Craven was appointed, the board had not yet formally established a Wildland Division. (Doc. 76-3 at 4). At some point, the board formally created the division and Craven assumed responsibility for the division's activities. Craven apparently operated the Wildland Division with some autonomy and he supervised several wildland firefighters. The parties have not explained the extent of Craven's responsibilities nor have they clearly explained how Craven was compensated. It appears Craven was paid an hourly wage when performing some types of work as Wildland Coordinator. While Craven managed the Wildland Division, some of the division's activities remained subject to Chief Garvin's control. For example, Chief Garvin decided when Craven and the Wildland Division's other firefighters would be sent out to fight particular fires.

Over the years, tensions arose between Chief Garvin and Craven regarding the management and use of the Wildland Division. According to Chief Garvin, Craven "was always complaining." (Doc. 72-1 at 35). Many of the complaints centered around what Craven viewed as ongoing "mismanagement of Wildland monies." For the most part, it appears the alleged "mismanagement" involved internal accounting decisions. (Doc. 75 at 3). That is, it was Craven's position that all the income and expenses attributable to the Wildland Division should be viewed entirely separately from the Fire District's other income and expenses. (Doc. 72-1 at 38). For example, Craven did not believe the cost of

a "water tender truck" purchased by the Fire District should be attributed to the Wildland Division because that truck was used almost exclusively for non-Wildland Division work. (Doc. 76 at 20).  Craven does not identify any law, regulation, or policy requiring such separate accounting practices.  It is undisputed Craven's repeated complaints led Chief Garvin to discuss some of his complaints with the board, such as whether the Wildland Division should have a separate bank account.  Chief Garvin and the board concluded a separate account was unnecessary.  (Doc. 72-1 at 40).

Beyond alleged financial "mismanagement," Craven alleges he repeatedly complained to Chief Garvin that the Fire District had failed to pay wildland firefighters for attending trainings and performing work.  Craven claims to have told Garvin "he was violating state and federal labor laws by not paying him and his crew" all they were owed.  (Doc. 72-24 at 3).  One particular incident involving only Craven occurred in 2018.  That year the Fire District decided to buy a new fire engine for the Wildland Division but the engine was in Illinois.  The Fire District paid Craven's airfare to fly to Illinois.  Craven would then drive the engine back to Arizona.  According to Chief Garvin, Craven "wanted to see his daughter somewhere between Illinois and Arizona." Thus, Chief Garvin and Craven allegedly agreed Craven would not be paid for the time he spent driving the truck back if he stopped to see his daughter on the way to Arizona. (Doc. 72-1 at 34).  Another Fire District employee testified Garvin and Craven both told her Craven "was never supposed to have any kind of payment for driving the truck back" to Arizona."  (Doc. 72-3 at 11).  Craven claims there was never such an agreement and he should have been paid for the time spent driving back to Arizona.  Craven states he "confronted Chief [Garvin] about" getting paid for the driving time but Chief Garvin merely stated "he would talk to the board."  (Doc. 76-3 at 22).  Craven was never paid for that travel time.  (Doc. 76-3 at 22).

From approximately 2010 through 2019, the Wildland Division's activities generated significant income for the Fire District.  According to Defendants, however, that income created financial difficulties because the Fire District incurred significant

- 4 -

costs fighting wildland fires and reimbursements of those costs often took several months.  "This resulted in large monthly swings in the [Fire] District's income and expenses."  (Doc. 72 at 4).  For example, in September 2018, the Fire District incurred over $35,000 in expenses due to the Wildland Division.  (Doc. 72-12 at 9, 14).  Those expenses were not immediately reimbursed.  Craven admits "there were occasions where it may take months for the Department to be reimbursed" for the Wildland Division's activities.  (Doc. 76 at 7).  But he seems to believe that delay was unimportant because he stresses reimbursement was always received, even if it was months later.  Chief Garvin took a different view.  According to Chief Garvin, the delay between incurring costs and obtaining reimbursements meant the Fire District "couldn't keep up with the money."  Thus, Chief Garvin claimed the Wildland Division was causing the Fire District to "run out of money."  (Doc. 72-1 at 54).

At some unidentified point in time, Craven began complaining to board member Mike Neill about limitations on his activities as Wildland Coordinator.  According to Neill, Craven "was upset because the chief wouldn't let him go out [and fight fires], but we didn't have the money to go out."  (Doc. 72-5 at 18).  In other words, Craven was frustrated that Chief Garvin was restricting the activities of the Wildland Division but Chief Garvin, and at least one board member, believed those restrictions were financially necessary.

In January 2019, the Fire District held a meeting attended by as many as thirty firefighters, including Craven.  During the meeting, Chief Garvin addressed the group and described the Fire District's drug and alcohol policy.  In doing so, Chief Garvin stated that if a firefighter had been drinking, he should not show up for work.  Chief Garvin then stated Craven "won't come out at night because he's got to suck on his bottle, but he's good help the next day."  (Doc. 76-3 at 14).  Craven immediately responded "They're cans."  Craven subsequently explained the statement by Chief Garvin left him "embarrassed and everything else."  (Doc. 76-3 at 15).  One of the other attendees at the meeting believed Chief Garvin's statement "belittled and deformed [sic]

[Craven's] character." (Doc. 76-20 at 15).

In early 2019, the board provided notice the March 2019 board meeting would address "Wildland" and "Budget." (Doc. 72-13 at 2). Board member Mike Neill explained at his deposition the board's intention was to "discuss the finances and whether or not we should continue a wildland division." (Doc. 72-5 at 18). Shortly before the meeting, Craven allegedly called Neill. According to Neill, Craven "sounded intoxicated, his words were slurring." (Doc. 72-5 at 15). Craven told Neill that Chief Garvin "was embezzling." (Doc. 72-5 at 15). Craven then attempted to backtrack and claimed he was not accusing Chief Garvin of embezzling. Instead, Craven was "just saying money's missing." (Doc. 72-5 at 17).

At the March 21 board meeting, Neill told the other board members about Craven's statements regarding embezzlement or missing money. (Doc. 72-5 at 17; 72-14 at 2). After some discussion, board member Sue Hileman "made a motion to dissolve the wildland division." (Doc. 72-14 at 2). That motion passed unanimously. There was an audio recording of the board's discussion regarding the Wildland Division, but that recording was subsequently destroyed.

Shortly after the meeting, Chief Garvin sent Craven a letter. That letter explained the board had dissolved the Wildland Division based, in part, on "the conflicts between staff, the Chief, and Board members." (Doc. 76-17 at 2). The letter also stated "[t]he amount of expenses incurred to create and maintain the Wildland Department, along with the length of time that is required to be refunded by the state is creating a strain on the entire Fire District." (Doc. 76-17 at 2). Thus, Craven was removed as Wildland Coordinator but he remained a volunteer firefighter.

In December 2019, Craven filed the present suit alleging ten claims against the fire board, the five members of the board, the Clay Springs-Pinedale Fire District, and Chief Garvin. Craven's ten claims are:

    1. Retaliatory discharge under the Arizona Employment Protection Act;

    2. First Amendment retaliation;

3.  Failure to pay minimum wages under the Fair Labor Standards Act ("FLSA");

4.  FLSA retaliation;

5.  Failure to pay wages under Arizona law;

6.  Failure to pay minimum wage and unlawful retaliation under Arizona Minimum Wage Act;

7.  Intentional interference with employment relationship under Arizona law;

8.  Defamation under Arizona law;

9.  False light under Arizona law; and

10. Retaliation in violation of Arizona's law allowing "public safety employees" to provide information to the board governing a fire district.

It appears claims one through six, as well as ten, are brought against all Defendants. Claims seven, eight, and nine appear to be brought solely against Chief Garvin.

## ANALYSIS

Craven's many claims appear to be overlapping and duplicative. In resolving Defendants' motion, the Court will follow the parties' briefing in grouping together similar claims.

### I.    Failure to Pay Wages

Craven brings a variety of claims based on the Fire District allegedly not paying him for all work he performed. While there are slight differences between these various claims, for present purposes the Court will analyze the unpaid wages claims under the standard applicable to a claim brought under the FLSA.[1]

For his FLSA claim, the burden is initially on Craven to show "he performed work for which he was improperly compensated." *McLaughlin v. Ho Fat Seto*, 850 F.2d 586,

---

[1] Craven asserts claims for unpaid wages under the FLSA and two Arizona statutes. The first Arizona statute is A.R.S. § 23-355(A) which allows a claim when an employer fails "to pay wages due" and the employee seeks to recover "an amount that is treble the amount of the unpaid wages. *See also Wood v. Nw. Hosp., LLC*, 473 P.3d 729, 737 (Ariz. Ct. App. 2020). The second Arizona statute is A.R.S. § 23-363(A) which allows a claim when an employer fails to pay the minimum wage identified in the statute. The parties do not identify any way the analysis of the FLSA and these state-law claims should differ.

589 (9th Cir. 1988).   Craven must produce "some evidence to show the amount and extent of [the unpaid] work as a matter of just and reasonable inference." *Id.*  This does not require Craven "prove the precise extent of uncompensated work." *Id.*  It is enough to provide general statements. *Id.*  Once Craven does so, "the burden shifts to the [Fire District] to come forward with evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from [Craven's] evidence." *Id.*

According to Defendants, "Craven has not produced any evidence that he completed [unpaid] work or that he ever sought any reimbursement for [the unpaid] work." (Doc. 71 at 11).  But the summary judgment record proves otherwise.  In a discovery response, Craven identified "approximately 190 hours" of unpaid work he allegedly performed.   (Doc. 72-22 at 17).  Those 190 hours include the "36 hours traveling to Illinois to pick up [the fire engine] and driving it back to Arizona." (Doc. 72-22 at 18).  Regarding those 36 hours, it is undisputed Craven drove the engine to Arizona.  It is also undisputed Craven was not paid for those 36 hours.  Thus, at the very least, there is a dispute of fact regarding Craven's entitlement to compensation for those 36 hours.

Beyond the 36 hours, Craven also states he provided "timecards" to Chief Garvin regarding time Craven spent on work activities, such as attending trainings. (Doc. 76-4 at 2).  Chief Garvin allegedly told Craven "the Board would not pay for this time." (Doc. 76-4 at 2).  The parties have not provided copies of those timecards nor have Defendants provided any explanation why, if the timecards were provided, Craven was not paid.  Accordingly, based on the present record, there are disputes of fact regarding Craven's FLSA and state-law claims for unpaid wages and the claims must proceed to trial.

Beyond contesting their liability for unpaid wages, Defendants argue that even if some wages were not paid, they cannot be liable for "liquidated or treble damages." (Doc. 71 at 12).   Under the FLSA and Arizona law, Defendants may be liable for liquidated or treble damages if Craven's wages were "willfully" withheld or if there was

no good faith dispute the wages were due.  Defendants claim they paid all wages owed but even if they did not, there is "[a]t most, a good faith dispute" whether Craven is entitled to additional wages.  (Doc. 71 at 12).  The present record is not sufficiently developed to grant summary judgment in favor of Defendants.  Again, Craven alleges he turned in "timecards," but the Fire District refused to pay for the work reflected on those timecards.  Knowingly refusing to pay for work reflected on timecards may be sufficient to establish Defendants acted with "reckless disregard" such that they can be liable for increased damages under the FLSA and Arizona law.  *See Haro v. City of Los Angeles*, 745 F.3d 1249, 1258 (9th Cir. 2014) (liquidated damages under FLSA require knowledge or "reckless disregard").

## II.    Retaliation Claims

Craven is pursuing numerous claims involving alleged retaliation for his speech.  Craven alleges retaliation theories under the Arizona Employment Protection Act, the First Amendment, an Arizona law regarding public safety employees, the FLSA, and the Arizona Minimum Wage Act.  Again, the parties have not clearly identified the exact speech at issue, which individual or entity heard that speech, and the precise acts the hearers took that allegedly constituted retaliation.  Instead, the parties have analyzed these claims on a very general level, apparently under the assumption that all Defendants are potentially liable under all the various retaliation theories.  By way of illustration, Craven seems to believe board member Joe Holyoak retaliated against him.  But Craven nowhere identifies the protected speech heard by Joe Holyoak nor does Craven point to the exact actions Joe Holyoak took in retaliation for that speech.[2]  As a result, in brief, the analysis of Craven's retaliation claims must be conducted at an inappropriately high level of generality.  But because on summary judgment all reasonable inferences are taken in favor of the plaintiff, summary judgment cannot be granted.  At trial, Craven will be

---

[2] Assuming Craven is relying solely on Holyoak's vote to dissolve the Wildland Division, the parties have not addressed whether the board members are entitled to legislative immunity for that vote.  *See, e.g.*, *Bechard v. Rappold*, 287 F.3d 827, 829 (9th Cir. 2002) ("Although the decision to eliminate a position for budgetary reasons is clearly legislative, the decision to demote and to discharge a specific individual is an administrative act that is not clothed in legislative immunity.").

required to establish liability on a statement-by-statement, defendant-by-defendant, and action-by-action basis.

### A. Arizona Employment Protection Act

As relevant here, the Arizona Employment Protection Act ("AEPA") states "[a]n employee has a claim against an employer for termination of employment only if . . . [t]he employer has terminated the employment relationship of an employee in retaliation for" the employee disclosing he has "information or a reasonable belief" that his employer violated the laws of Arizona.   A.R.S. § 23-1501(A)(3); *Galati v. Am. W. Airlines, Inc.*, 69 P.3d 1011, 1013 (Ariz. Ct. App. 2003) (recognizing AEPA provides claim "when the employer terminates an employee in retaliation . . . for reporting violations of Arizona law to the employer's management").

Craven alleges he complained of violations of Arizona law to Chief Garvin and the board.  After doing so, Craven says he was retaliated against, apparently by the board voting to dissolve the Wildland Division.  That vote resulted in Craven losing his position as Wildland Coordinator.  Defendants seek summary judgment arguing there are no facts establishing Craven suffered a sufficient "termination of employment" to trigger liability under the AEPA.   According to Defendants, Craven was employed as a volunteer firefighter before being appointed Wildland Coordinator and he remained a volunteer firefighter after he was terminated from the position of Wildland Coordinator.   Thus, Defendants argue Craven did not experience a "termination of employment" as that term is used in the AEPA.

The parties have failed to cite any Arizona authority addressing when, if ever, a demotion can qualify as a "termination of employment" under the AEPA.  But the approach to the AEPA adopted by Arizona courts points away from such a reading.  As explained by the Arizona Court of Appeals, the AEPA was passed to "limit[] the situations in which an employee may bring a wrongful termination suit." *Hart v. Seven Resorts Inc.*, 947 P.2d 846, 850 n.7 (Ariz. Ct. App. 1997).  And the AEPA "addresses claims for 'termination of employment' but not other wrongful employment acts or

omissions." *Taylor v. Graham Cty. Chamber of Com.*, 33 P.3d 518, 521 (Ariz. Ct. App. 2001).

Given the statement that the AEPA was meant to address terminations of employment but not "other wrongful employment acts or omissions," a demotion is not sufficient to trigger liability under the AEPA.[3]  *Cf. Taylor v. Graham Cty. Chamber of Com.*, 33 P.3d 518, 525 (Ariz. Ct. App. 2001) (noting the AEPA's "primary purpose was to circumscribe, not broaden, wrongful termination claims based on alleged violations of public policy").  Defendants are therefore entitled to summary judgment on Craven's AEPA claim.

**B. First Amendment and Public Safety Employee Protections**

Craven claims the loss of his position as Wildland Coordinator was unlawful retaliation in violation of the First Amendment and A.R.S. § 23-1411(A).  That Arizona statute provides a "public safety employee" is entitled "to present proposals and testimony to the governing body of any . . . fire district and their representatives" and an employee "shall not be discharged, disciplined or discriminated against because of the exercise of these rights."  A.R.S. § 23-1411(A).  The parties agree the retaliation analysis is the same under the First Amendment and § 23-1411.  The Court will assume the same.[4]

The Ninth Circuit has established a "sequential five-step series of questions" for courts to use when analyzing a public employee's First Amendment retaliation claim. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  The five questions are:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

---

[3] The AEPA authorizes relief where an employee has not been formally terminated but his employer has subjected him to sufficiently onerous conditions such that the employee should be viewed as constructively discharged.  A.R.S. § 23-1502.  Craven does not argue his demotion should be viewed as a constructive discharge.

[4] "Arizona courts have not specified a standard for evaluating claims under A.R.S. § 23-1411(A)," but the Ninth Circuit has applied the "First Amendment retaliation test." *Candelaria v. City of Tolleson, Arizona*, 721 F. App'x 588, 591 (9th Cir. 2017).

*Id.*  The plaintiff bears the burden on the first three questions but, if he carries that burden, "the burden shifts to the defendant on the last two questions."  *Greisen v. Hanken*, 925 F.3d 1097, 1108 (9th Cir. 2019).

In seeking summary judgment, Defendants challenge only two steps of the sequence.  First, Defendants argue Craven's speech was not on a matter of "public concern."  Second, Defendant argue "Craven's conduct was not a but-for cause of the [Fire] District's decision to dissolve the Wildland Division."  (Doc. 71 at 7).  Craven responds to the first argument but does not respond to the second.

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  *Lane v. Franks*, 573 U.S. 228, 241 (2014).  The public concern "inquiry turns on the content, form, and context of the speech."  *Id.*  Thus, a plaintiff must provide "sufficient information about the content, form and context of speech" to allow a court "to determine whether it was on a matter of public concern."  *Greisen v. Hanken*, 925 F.3d 1097, 1110 (9th Cir. 2019).  But this does not mean a plaintiff is required to produce "transcriptions of the conversations."  *Id.*  Rather, a plaintiff need only provide "a general timeline" along with the general content of the relevant communications.  *Id.*

It is well-established that "[s]peech about inefficiency in managing and operating government entities is [speech about] a matter of inherent public concern."  *Moonin v. Tice*, 868 F.3d 853, 864 (9th Cir. 2017).  A recent case similar to the present one addressed this point at length.  In that case a police officer became suspicious a city manager "was hiding something" regarding the city's budget.  *Greisen v. Hanken*, 925 F.3d 1097, 1105 (9th Cir. 2019).  Those suspicions prompted the officer to ask questions "about the city's budgeting practices."  *Id.*  The officer was later terminated and he brought a retaliation claim against the city manager.  The Ninth Circuit concluded it had been "clearly established" for over twenty years that a public employee's complaints regarding "the misuse of public funds is a matter of public concern."  *Id.*  at 1111.  *See*

*also Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 906 (9th Cir. 2021) ("At the apex of the First Amendment rests speech addressing problems at the government agency where the employee works.").

Here, Defendants argue Craven did not complain about matters of public concern. According to Defendants, Craven only complained "about his personal disputes with, and grievances against, Chief Garvin, his management style, and his decision making." (Doc. 71 at 6-7). But the record, viewed in the light most favorable to Craven, establishes Craven repeatedly complained about perceived financial mismanagement of the Fire District and the Wildland Division. (Doc. 76-1 at 38). In particular, Craven complained to board member Neill "that Chief was embezzling," or as Craven later attempted to reformulate his position, he believed "there's money missing." (Doc. 76-2 at 23-24). A public employee's complaints of embezzlement or "money missing" qualify as speech on matters of public concern. Defendants are not entitled to summary judgment based on the content of Craven's speech.

The only other basis on which Defendants seek summary judgment regarding the claims under the First Amendment and A.R.S. § 23-1411(A) is that Craven's speech was not "a but-for cause" of the board's decision to dissolve the Wildland Division. (Doc. 71 at 7). In the context of a public employee's retaliation claim, the burden regarding this issue is on the employer. Thus, this element can be viewed as an "affirmative defense." *Ostad v. Oregon Health Scis. Univ.*, 327 F.3d 876, 885 (9th Cir. 2003). If an employer wishes to invoke this affirmative defense, it must show "the employee's protected speech was not a but-for cause of the adverse employment action." *Eng v. Cooley*, 552 F.3d 1062, 1072 (9th Cir. 2009). That is, the employer must show it "would have made the same employment decisions even absent the questioned speech." *Id.*

In opposing summary judgment, Craven does not address this argument. Rather, Craven repeatedly argues he has sufficient evidence to establish dissolution of the Wildland Division "was motivated by . . . Plaintiff's good faith concerns of gross financial mismanagement and actual and possible violations of law." (Doc. 75 at 8). But

even accepting that is true, the issue of "but-for" causation remains. Put in terms of the five steps, Craven has focused his argument entirely on the third step, *i.e.* whether his "protected speech was a substantial or motivating factor in the adverse employment action." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). But Defendants' summary judgment argument is based on the fifth step, *i.e.* whether the Fire District board would have dissolved the Wildland Division "even absent the protected speech." *Id.*

Determining whether Defendants would have made the same decision "even absent the protected speech" is "purely a question of fact" but summary judgment can be granted when a plaintiff fails to "dispute" the issue. *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1072 (9th Cir. 2012). Given Craven's failure to address the issue directly in his summary judgment opposition, summary judgment could be granted. But the Court is permitted to consider the entire record and there are aspects of that record Craven cites in other contexts showing there are disputes of fact regarding the reason the board dissolved the Wildland Division.

It is undisputed the Wildland Division's activities were creating accounting issues for the Fire District. Craven admits "there were occasions where it may take months for the [Fire District] to be reimbursed." (Doc. 76 at 7). And he further admits "[t]his resulted in large monthly swings in the [Fire] District's income and expenses." (Doc. 76 at 7). In addition, Starla Kizzar, the "Clerk and Office Manager" for the Fire District, did not believe the Wildland Division was financially sound. (Doc. 75 at 4). Kizzar created a document outlining the Fire District's "profit and loss" and the impact the Wildland Division was having. In Kizzar's opinion, "wildland was not a fiscally sound operation for such a small department that has a limited fund." (Doc. 72-3 at 8). Kizzar shared that information with Chief Garvin and the board.[5] (Doc. 72-3 at 8).

This evidence establishes the board might have had a legitimate financial reason

---

[5] In his "Additional Undisputed Material Facts," Craven states Kizzar's document "was inaccurate and significantly under-reported the profits made by the Wildland Division by almost $120,000." (Doc. 76 at 19). In support of this statement, Craven cites to the depositions of Chief Garvin, Neill, and Kizzar. The referenced deposition excerpts, however, contain no statements establishing Kizzar's document was off by approximately $120,000.

for dissolving the Wildland Division.  But there is other evidence showing that financial reason may not have been sufficient on its own.  Shortly after the board's decision to dissolve the Wildland Division, another firefighter recorded a conversation with Chief Garvin.  During that conversation, Chief Garvin explained the decision to dissolve the Wildland Division: "A lot of it was [Craven's] attitude.  I mean, he's threatening the Board members, threatening me a lot."  Chief Garvin then stated, "I can't make the budget work."  (Doc. 76-22 at 4).  But Chief Garvin also claimed the decision to dissolve the division "really, basically, came down to [Craven's] threats . . . Moneywise, it wasn't that big a difference."  (Doc. 76-22 at 6).  When asked if the Wildland Division would ever come back, Chief Garvin stated "[a]s soon as you get me a red card – or an engine card," meaning as soon as there was another individual with the qualifications to run the Wildland Division, the Fire District would reestablish it.  (Doc. 76-22 at 7).  Finally, Chief Garvin told the firefighter "the Board didn't fire you for moneywise. . . . and they didn't fire [Craven], they just dissolved the Wildland . . . Because of the turmoil [Craven's] caused them."  (Doc. 76-22 at 8).

Based on these statements, there is a genuine dispute of material fact whether the Wildland Division would have been dissolved even if Craven had not engaged in protected speech regarding budget issues.  Therefore, the First Amendment and A.R.S. § 23-1411(A) claims must proceed to trial.[6]

## C.  FLSA and Arizona law

Craven alleges the Wildland Division was dissolved because of his complaints to Chief Garvin regarding alleged violations of federal and state wage laws.  In particular, Craven alleges he complained to Chief Garvin about these issues "merely days" before the board dissolved the Wildland Division.  (Doc. 75 at 14).  As set forth above regarding Craven's other retaliation claims, there is genuine uncertainty regarding why the board voted to dissolve the Wildland Division.  Whether the board was motivated by alleged

---

[6] Craven argues the destruction of the audio recording of the board meeting was spoliation of evidence such that he is entitled to a presumption the recording would have been favorable to his claims.  (Doc. 75 at 9).  The remedy for the destruction of the recording, if any, can be resolved in pretrial filings.

1  financial stress caused by the Wildland Division or Craven's many "complaints"

2  regarding wage issues must be resolved at trial.[7]

### III.   Intentional Interference with Employment

4  Craven alleges a claim against Chief Garvin for intentional interference with his

5  employment contract.  Chief Garvin seeks summary judgment on this claim, arguing

6  "[o]nly a third party to a contract or employment relationship may be liable for tortious

7  interference." (Doc. 71 at 13).  Craven responds that Arizona law allows for a supervisor

8  to be liable for "tortious interference" if the supervisor "intentionally and improperly

9  interfered." (Doc. 75 at 15).  It is not clear what Craven is trying to argue as intentional

10  and improper interference are simply some of the basic elements required for this claim.

11  But regardless of Craven's position, Arizona law is straightforward.

12  "[W]hen an individual supervisor/defendant was acting within the scope of

13  authority as a management representative, he or she was, in effect, the employer, and

14  could not interfere with his or her own contract." *Higgins v. Assmann Elecs., Inc.*, 173

15  P.3d 453, 457 (Ariz. Ct. App. 2007).  Here, Chief Garvin was acting in the scope of his

16  authority in reporting to the board.  Therefore, Chief Garvin cannot be liable for

17  interfering with Craven's employment contract.  Chief Garvin is entitled to summary

18  judgment on this claim.

### IV.   Defamation and False Light

20  In seeking summary judgment Chief Garvin identified five statements that Craven

21  previously identified as the basis for his defamation and false light claims.  (Doc. 76 at

22  15-16).  Craven's opposition to the motion for summary judgment addresses only one of

23  the statements.[8]  Therefore, the Court will treat the other four statements as abandoned

24  and analyze the only statement Craven squarely addresses in his summary judgment

---

[7] In the context of FLSA retaliation, the "dual motive" test still applies.  *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996).  Under that test, Craven must show his FLSA-protected complaints were a "substantial factor" in the decision to dissolve the Wildland Division and Defendants may then avoid liability by showing the same decision would have been reached even if "the proper reason alone had existed." *Id.*

[8] Craven mentions some of the other statements but does not present any arguments regarding those statements.  (Doc. 75 at 15-16).

opposition.

In January 2019, Chief Garvin stated Craven "won't come out at night because he's got to suck on his bottle, but he's good help the next day." (Doc. 76-3 at 14). Chief Garvin argues the content of this statement is not sufficient to support liability under a defamation claim. Chief Garvin further claims the number of individuals present at the time cannot support liability under a false light claim. Neither argument is convincing.

To establish liability on his defamation claim, Craven must point to evidence that Chief Garvin published a false communication that brought Craven "into disrepute, contempt, or ridicule," or that impeached Craven's "honesty, integrity, virtue, or reputation." *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989). Chief Garvin argues the statement about Craven needing to "suck on his bottle" was "intended and interpreted as a figurative or hyperbolic joke, not a factual accusation against Craven." (Doc. 71 at 15).

"Whether a statement is capable of defamatory meaning is a question of law for the court, but whether the meaning conveyed was defamatory is a question for the jury." *Dube v. Likins*, 167 P.3d 93, 106 (Ariz. Ct. App. 2007). In deciding whether "a statement is even capable of a defamatory meaning," the Court must evaluate "all the circumstances." *Id.* Thus, the Court must determine whether Chief Garvin's statement was "one that stated or implied an assertion of objective fact from the point of view of the reasonable person hearing it at the time and under the circumstances under which it was made." *Yetman v. Eng.*, 811 P.2d 323, 328 (Ariz. 1991).

A reasonable person hearing Chief Garvin's statement might interpret the statement as stating or implying "an assertion of objective fact," *i.e.* that Craven could not work at night because "he's got to" drink alcohol. Whether Craven's consumption of alcohol did, in fact, prevent him from working presents an issue of objective fact. At the very least, as explained by the Arizona Supreme Court, in "cases involving assertions to which reasonable people might clearly give conflicting interpretations . . . the question must be left to the jury." *Id.* at 331.

As for Chief Garvin's position that the statement was not capable of defamatory meaning because it did not bring Craven "into disrepute, contempt or ridicule," the statement is at least *capable* of doing so.  Asserting that Craven was unable to function at night because of his need to drink alcohol could subject Craven to ridicule or bring his character into disrepute.  *See, e.g.*, *Dube v. Likins*, 167 P.3d 93, 106 (Ariz. Ct. App. 2007) (statements that student had "committed an 'indiscretion' or 'transgressions,'" were "capable of defamatory meaning").  The defamation claim must proceed to trial.

Craven has a separate claim for "false light invasion of privacy" based on the same "suck on his bottle" statement.  False light "is recognized in Arizona as a tort separate from defamation."  *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 450 (Ariz. Ct. App. 2015).  But the distinction between false light and defamation is "subtle."  *Id.*  "In most cases, the false light theory will add little if anything beyond the relief a defamation or emotional distress claim will provide."  *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 788 (Ariz. 1989).  However, a false light claim can be viewed as slightly broader than a defamation claim in that a false light claim may be based on "the publication of true information" if that publication "creates a false implication about the individual."  *Id.*  Moreover, "Arizona law allows false light plaintiffs to recover damages for injuries that are distinct from the injuries" redressable by "a parallel defamation claim."  *Ultimate Creations, Inc. v. McMahon*, 515 F. Supp. 2d 1060, 1068 (D. Ariz. 2007).

For his false light claim, Craven must show Chief Garvin gave "publicity" to a statement "with knowledge of falsity or reckless disregard for the truth" that placed Craven in a false light, and "the false light in which [Craven] was placed would be highly offensive to a reasonable person in [Craven's] position."  *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 450 (Ariz. Ct. App. 2015).  Of particular importance, the "publicity" requirement for a false light claim is different than the "publication" requirement for a defamation claim.  While "publication" for a defamation claim "includes any communication by the defendant to a third person," the "publicity"

necessary for a false light claim is more demanding. *Hart v. Seven Resorts Inc.*, 947 P.2d 846, 854 (Ariz. Ct. App. 1997). To meet the false light "publicity" requirement, the communication must have been made "to the public at large, or to so many persons that the matter must be regarded substantially certain to become one of public knowledge." *Id.* Thus, it is not enough to make a statement "to a single person or even to a small group of persons." *Id.* Instead, the statement must have been made "in a newspaper or magazine, even of small circulation" or "in an address to a large audience." *Id.*

The sole basis on which Chief Garvin seeks summary judgment regarding Craven's false light claim is the alleged failure to meet the "publicity" requirement. According to Chief Garvin, the "bottle" statement was not "communicated to the public at large." (Doc. 71 at 16). There is, however, a dispute of fact regarding whether this requirement is met. The statement was made at a meeting attended by possibly as many as thirty individuals. Unfortunately, the parties have not cited any authority addressing the line between a "small group" and a "large audience." But viewed in the light most favorable to Craven, thirty individuals could qualify as a "large audience." Therefore, there is a dispute of fact regarding the publicity element and the false light claim must proceed to trial.

**V.     Summary**

All claims must proceed to trial with the exception of the claim under the AEPA and the claim for intentional interference with employment relationship. Based on Craven's briefing, however, the only statement at issue for the defamation and false light claims is Chief Garvin's "bottle" statement.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 71) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** all Motions in Limine are due **November 26, 2021**. Responses are due ten days afterward. No replies are permitted unless ordered by the Court. Prior to filing any Motion in Limine, the parties must confer and discuss the

contents of each planned motion.  No Motion in Limine should be filed if the other party does not oppose the relief requested.

**IT IS FURTHER ORDERED** the Joint Proposed Pretrial Order is due **November 19, 2021**.

**IT IS FURTHER ORDERED** the parties shall review the Court's standard Juror Questionnaire (available on the Court's website) and submit **NO MORE THAN FIVE PROPOSED QUESTIONS EACH** to be added to the standard Juror Questionnaire with the Court's approval no later than **November 5, 2021**.  Each proposed question shall stand alone and shall not contain sub-parts.

**IT IS FURTHER ORDERED** the parties shall submit a Joint Statement of the Case, of no more than a few short sentences for the Juror Questionnaire, no later than **November 5, 2021**.

**IT IS FURTHER ORDERED** the parties shall submit a second Joint Statement of the Case, of no more than two short paragraphs to be read to the jury, no later than **November 19, 2021**.

**IT IS FURTHER ORDERED** no later than **November 19, 2021**, the parties shall file and submit via email (silver_chambers@azd.uscourts.gov) in Word format proposed Jury Instructions in compliance with the procedures available on the Court's website, including but not limited to: 1) a *joint* set of proposed jury instructions where the parties' instructions agree; 2) a separate set of instructions (one for each party) where the parties do not agree; and 3) legal authority supporting all proposed instructions whether the parties agree or not.  Where the parties do not agree, the opposing party shall clearly state its objection to the proposed instruction and the proposing party shall clearly state its response.

**IT IS FURTHER ORDERED** the parties will jointly file a proposed form of verdict, or if the parties do not agree, they may separately file proposed forms of verdict no later than **November 19, 2021**.

…

1    **IT IS FURTHER ORDERED** no later than **November 19, 2021**, the parties shall

2    deliver to chambers excerpts of the deposition testimony they propose to present at trial,

3    in compliance with the procedures available on the Court's website (found in Deposition

4    Designation Procedure for Judge Silver), including but not limited to: Plaintiffs

5    highlighting in yellow the portions they wish to offer and Defendants highlighting in blue

6    those portions they wish to offer.  If either party objects to the proposed testimony, a

7    specific and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin

8    adjacent to the proposed testimony.

9    **IT IS FURTHER ORDERED** a final pretrial conference is set for **January 11,**

10   **2022, at 2:00 p.m.**, at which time the Court will review Juror Questionnaires.   The

11   parties shall meet and confer prior to this date regarding the Juror Questionnaires and

12   email to the Courtroom Deputy no later than noon on **January 6, 2022**, a list of any

13   jurors they agree should be stricken for cause, along with any objections to jurors they do

14   not agree should be stricken for cause.  **The parties shall not file this list.**  The Court

15   will rule on any disputed jurors at the final pretrial conference.

16   **The parties will be supplied a disk containing the questionnaires**

17   **approximately one week prior to the final pretrial conference.  Counsel shall bring a**

18   **copy of the questionnaires to the conference for review.  Counsel are required to**

19   **return the disk to the Courtroom Deputy and destroy all copies of the**

20   **questionnaires no later than the last day of trial.**

21   **IT IS FURTHER ORDERED** trial to a jury is set for **January 25, 2022 at 9:00**

22   **a.m.**  Estimated length of trial is four days.

23   …

24   …

25   …

26   …

27   …

28   …

- 21 -

1

**IT IS FURTHER ORDERED** the parties shall comply with the Exhibit

2

Procedures found on the Court's website at www.azd.uscourts.gov / Judges' Information

3

/ Orders, Forms & Procedures for Hon. Roslyn O. Silver.

4

Dated this 19th day of August, 2021.

5

6

7

Honorable Roslyn O. Silver

8

Senior United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28